UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

---

**Case No. 25-30107**

---

*Apex Hospitality Group, L.L.C.,*

       *Plaintiff - Appellee*

*v.*

*Independent Specialty Insurance Company,*

       *Defendant - Appellant*

---

On Appeal from U.S. District Court, Eastern District of Louisiana,
Case No. 2:23-cv-2060 Hon. Jane Triche Milazzo, Judge Presiding

---

**BRIEF OF APPELLANT INDEPENDENT SPECIALTY INSURANCE COMPANY**

---

Submitted by:

Raymond C. Lewis (#31236)
rlewis@deutschkerrigan.com
Joseph L. McReynolds (#01947)
jmcreynolds@deutschkerrigan.com
Bryce M. Addison (#36345)
baddison@deutschkerrigan.com
Sean P. Mount (#27584)
smount@deutschkerrigan.com
**DEUTSCH KERRIGAN, L.L.P.**
755 Magazine Street
New Orleans, LA  70130
(504) 581-5141

CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest

in the outcome of this case. These representations are made in order that the judges

of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Apex Hospitality Group, L.L.C. | Michael Lane<br>Lane Law Group, L.L.C. |

| Appellants: | Counsel for Appellants: |
|---|---|
| Independent Specialty Insurance Company | Raymond Lewis<br>Joseph McReynolds<br>Bryce Addison<br>Sean P. Mount<br>Deutsch Kerrigan, L.L.P. |

| Other Persons/Entities: | Counsel: |
|---|---|
| Certain Underwriters at Lloyd's – Syndicate 1458, whose sole member is RenaissanceRe Corporate Capital (UK) Ltd. | None |
| RenaissanceRe Specialty U.S. Ltd. | None |

*/s/ Raymond C. Lewis*
Raymond C. Lewis
Attorney of Record for Independent
Specialty Insurance Company

i

ORAL ARGUMENT WOULD BE HELPFUL IN THIS MATTER

Pursuant to FED R. APP. PROC. 34, the Court should grant oral argument. This case involves an important interpretation of a federal treaty and statute. In addition, it is one of numerous cases presenting the issue coming before this Court. Although the Court could resolve this case in Appellant's favor by applying the plain text of the Convention on the Recognition and Enforcement of Arbitral Awards of June 10, 1958 or even *Bufkin Enterprises, L.L.C. v. Indian Harbor Ins. Co.*, 96 F.4th 726 (5th Cir. 2024) (*per curiam*), it should also grant oral argument.

By the time this case is fully briefed, the Court may have before it multiple cases that may be dispositive of this appeal, *i.e.*, *Town of Vinton v. Indian Harbor*, No. 24-30035 (5th Cir.) and *Indian Harbor Ins. Co., et al. v. Belmont Commons, L.L.C., d/b/a 925 Common, et al.*, No. 25-30047 (5th Cir.), which is ahead of this case in the briefing schedule. The Court may wish to hold this case pending these other cases to avoid the possibility of simultaneous opinions.

TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

ORAL ARGUMENT WOULD BE HELPFUL IN THIS MATTER .......................... ii

TABLE OF AUTHORITIES ................................................................................... v

I.      JURISDICTIONAL STATEMENT ......................................................... 1

II.     STATEMENT OF THE ISSUES ............................................................ 1

III.    STATEMENT OF THE CASE ................................................................ 3

        A.      Apex was issued a surplus lines policy with two participating
                insurance carriers ................................................................ 3

        B.      Apex's surplus lines Policy includes an Arbitration Agreement. ......... 4

        C.      Apex made an insurance claim under the Policy to both Insurers
                but, later, only sued its domestic surplus lines insurer to
                circumvent the Convention. ................................................. 5

        D.      The district court wrongly vacated its original order compelling
                arbitration. ........................................................................ 7

IV.     SUMMARY OF THE ARGUMENT ...................................................... 10

V.      STANDARD OF REVIEW .................................................................. 11

VI.     LAW AND ARGUMENT ..................................................................... 12

        A.      The Convention required the district court to enforce the
                Policy's Arbitration Agreement. ........................................ 14

                1.      The Convention is a federal treaty implemented by
                        federal statute and preempts all relevant state law. .......... 14

                2.      The Convention directly applies because the Arbitration
                        Agreement meets all the requirements for enforcement
                        under the Convention. ............................................. 16

TABLE OF CONTENTS

3.  Under federal law, the Policy is one agreement to which all the Insurers—domestic and foreign—are parties, and all the Insurers and Apex collectively agreed to its Arbitration Provision. ...............................................18

B.  Even if the ISIC's contract is considered separate, equitable estoppel would still mandate arbitration under the Convention. .........27

1.  *Bufkin's* compelling arbitration under the Convention through federal equitable estoppel is dispositive of this case. .......................................................................................27

2.  *Bufkin* correctly recognized that federal common law, not state law, governs equitable estoppel under the Convention. ...............................................................................30

3.  *Bufkin* identified that clever pleading strategies to circumvent the Convention is gamesmanship that runs contrary to all notions of equity and fairness. ...........................39

C.  The Arbitration Agreement's delegation clause requires the Court to compel arbitration. .............................................................40

VII. CONCLUSION ..................................................................................42

CERTIFICATE OF SERVICE .........................................................................43

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................................44

TABLE OF AUTHORITIES

<u>Cases</u>

*Adriatic Fire Ins. Co. v. Treadwell,* 108 U.S. 361 (1883) ........................................23

*Arrive NOLA Hotel, LLC v. Certain Underwriters at Lloyds, London*, No. CV 24-1585, 2025 WL 871608 (E.D. La. Mar. 20, 2025)............................ 13, 28

*Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG,* 783 F.3d 1010 (5th Cir. 2015))........................................................................26

*Beiser v. Weyler*, 284 F.3d 665 (5th Cir. 2002) ........................................34

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) ............................ *passim*

*Brown v. Pacific Life Ins. Co.,* 462 F.3d 384 (5th Cir. 2006)..............................31

*Brundage Mgmt. Co., Inc. v. Certain Underwriters Lloyd's London, et al.*, No: 22-3780 (E.D. La. 7/2/2025) (Milazzo, J.)....................................12

*Bufkin Enterprises, L.L.C. v. Indian Harbor Ins. Co.,* 96 F.4th 726 (5th Cir. 2024) ...................................................................................... *passim*

*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208 (9th Cir. 2016) ...................................................................................... 16, 23

*Cent. Pines Land Co. v. U.S.*, 274 F.3d 881 (5th Cir. 2001) ....................................35

*Certain Underwriters at Lloyd's London v. Belmont Commons LLC, et al.*, No. CV 22-3874, 2025 WL 239087 (E.D. La. Jan. 17, 2025) ..............................9

*Crescent City Surgical Operating Co. v. Certain Underwriters at Lloyd's, London, et al.,* No. 22-2625, 2025 WL 239404 (E.D. La. Jan. 17, 2025) ............9

*Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270 (5th Cir. 2002)....... 10, 27

*Franco v. Mabe Trucking Co.,* 3 F.4th 788, 798 (5th Cir. 2021) ............................15

*Freudensprung v. Offshore Tech. Servs*., 379 F.3d 327 (5th Cir. 2004))................17

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432 (2020)...................................................... 36-37

*Grigson v. Creative Artists Agency LLC*, 210 F.3d 524 (5th Cir. 2000) ......... *passim*

*InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003)) ...........................................35

*Jiangsu Beier Decoration Materials Co. v. Angle World LLC*, 52 F.4th 554 (3d Cir. 2022) ...........................................................................................37

*Kubala v. Supreme Prod. Servs., Inc.,* 830 F.3d 199 (5th Cir. 2016)............... 40-41

*LMP Props., L.L.C. v. Interstate Fire & Cas. Co*., No. 23-30833, 2024 WL 2988938 (5th Cir. June 14, 2024)...........................................................30

*Mangaroo v. Nelson,* 864 F.2d 1202 (5th Cir. 1989) ..............................................35

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614 (1985)............................................................................... 16, 26, 34

*Nehme v. Immigr. & Naturalization Serv*., 252 F.3d 415 (5th Cir. 2001)... 10-11, 15

*Olsen Sec. Corp. v. Certain Underwriters at Lloyd's London,* No. CV 22-3120, 2025 WL 1370445 (E.D. La. May 12, 2025) (Brown, C.J.)).............. 31, 38

*Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, (11th Cir. July 8, 2022), 2022 WL 2643936 ................................................... *passim*

*Police Jury of Calcasieu Parish v. Indian Harbor Ins. Co.,* 2024-00449 (La. 10/25/24), 395 So.3d 717 ............................................................... *passim*

*Parish of Lafourche v. Indian Harbor Ins. Co.,* Nos. 24-3479, 24-3475, 2025 WL 754333 (E.D. La. Mar. 10, 2025)..................................... 13, 31, 38

*Parish of St. Charles v. HDI Global Spec. SE*, No. 22-3404, 2025 WL 1142397 (E.D. La. Apr. 17, 2025).......................................................12

*Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,* 587 F.3d 714 (5th Cir. 2009) ................................................................ 16, 30

*Scherk v. Alberto-Culver Co.,* 417 U.S. 506 (1974) ........................................ 15, 33

*A Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc*., 198 F.3d 88 (2d Cir. 1999) ...................................................................16

*Southland Square Apart., LLC v. Certain Underwriters at Lloyd's, London*, 23-CV-2329, 2024 WL 5086081 (E.D. La. Dec. 12, 2024)................................12

*Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630 (1981)* ..........................32

*Wallach v. Eaton Corp.,* 837 F.3d 356 (3d. Cir. 2016) ..........................................23

*Woo Kee Trading, Inc. v. Certain Underwriters at Lloyd's, London*, No. 23-6523, Doc. 27.......................................................................................................12

*8692 River Road, LLC v. Certain Underwriters at Lloyd's, London*, No. 23-6973, Doc. 46.......................................................................................................12

## Statutes

La. Rev. Stat. § 22:868 ................................................................ *passim*
9 U.S.C. § 16 ..................................................................................................1
9 U.S.C. § 202..................................................................................... *passim*
9 U.S.C. § 203 ...........................................................................................1, 15
9 U.S.C. § 205 ..................................................................................................1
28 U.S.C. § 1331 ..............................................................................................1
28 U.S.C. § 1332 ..............................................................................................1
28 U.S.C. § 1441 ..............................................................................................1
28 U.S.C. § 1446 ..............................................................................................1

## Treaty(ies)

Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ............................................................ *passim*

## Other References

*Restatement (Second) of Contracts* § 1 ............................................... 23-24
*Restatement (Second) of Contracts* § 288 ...............................................23
21 Lord, *Williston on Contracts* § 36.1 ....................................................23
21 Lord, *Williston on Contracts* § 57:61 .................................................38
91 Born, *International Commercial Arbitration* § 10.05 ............................ 37, 38

# I.    JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction because this is an interlocutory appeal as of right from a district court's denial of a motion to compel arbitration and refusal to stay proceedings pending arbitration. 9 U.S.C. § 16(a)(1)(A)-(C). The district court had subject matter jurisdiction because Appellee sued Appellant in Louisiana state court and Appellant properly removed the case to the federal district court under 9 U.S.C. § 205 and 28 U.S.C. §§ 1331, 1441, and 1446 based on the district court's subject matter jurisdiction over the case (i) under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 9 U.S.C. §§ 202, 203 and (ii) under 28 U.S.C. § 1332 because the amount in controversy exceeds the jurisdictional threshold and complete diversity exists between the parties.

# II.    STATEMENT OF THE ISSUES

1.    The Convention on the Recognition and Enforcement of Arbitral Awards of June 10, 1958 (the "Convention") requires a United States court to compel arbitration if there is an agreement in writing providing for arbitration in the territory of a Convention signatory and a party to the agreement is foreign. Here, a policy of surplus lines insurance was issued to Apex Hospitality Group, LLC by a domestic and foreign insurer containing an Arbitration Agreement to which all parties agreed. The district court originally compelled arbitration but later vacated that order. Did the district court err by vacating its order compelling arbitration?

2.      This Court has held that the doctrine of equitable estoppel can be used to enforce arbitration agreements under the Convention when a signatory to the contract containing the Arbitration Agreement raises allegations of substantially interdependent and concerted conduct by both a non-signatory and one or more signatories. Apex Hospitality Group, LLC asserted an insurance claim against a domestic and foreign insurer but purposefully sued only the domestic insurer, ISIC, to circumvent arbitration under the Convention. Did equitable estoppel mandate the district court maintain its previous order compelling arbitration?

3.      This Court, in *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524 (5th Cir. 2000) and *Bufkin Enterprises, L.L.C. v. Indian Harbor Ins. Co*., 96 F.4th 726 (5th Cir. 2024), held that equitable estoppel can be used to allow a non-signatory to a contract with an arbitration clause to compel arbitration with a signatory when a signatory to a contract containing an arbitration clause raises allegations of substantially "interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Grigson,* 210 F.3d at 527-28; *Bufkin*, 96 F.4th at 731. The district court failed to apply this Court's "interdependent and concerted misconduct" test. This was an abuse of discretion because Apex failed to differentiate purported wrongful conduct by the domestic insurer and foreign insurer and alleges negligent conduct that was "interdependent and in concert" as it relates to their handling of Apex's insurance claims.

2

## III.   STATEMENT OF THE CASE

### A.   Apex was issued a surplus lines policy with two participating insurance carriers.

Appellant, Independent Specialty Insurance Company ("ISIC"), and Certain Underwriters at Lloyd's ("Lloyd's") (collectively referred to as "Insurers") agreed to participate in a surplus lines insurance policy ("the Policy") issued to Apex Hospitality Group, L.L.C. ("Apex"). The Policy insured buildings, properties, and contents located at 6751 Westbank Expressway in Marrero, Louisiana, which was a three-story, 73-room Comfort Inn.

Surplus lines carriers offer a niche insurance product for unique, high-risk, or specialized situations that standard insurance companies are unwilling to cover. [ROA.25-30107.284-285.] Surplus lines carriers have more freedom and flexibility for accepting risks and designing and pricing their policies to meet a specific risk that standard insurance companies cannot. Surplus lines insurance options are especially important given the current property insurance crisis in Louisiana.[1]

Apex's surplus lines Policy, bearing policy number 2021-803800-01, had an effective date of July 19, 2021 to July 19, 2022. The Policy was composed of a General Property Policy Declarations, a Small Commercial Property Form, and

---

[1] *See e.g.* La. Dep't of Ins., Press Conference to Preview the La. Dep't. of Ins. 2023 Legislative Package, https://www.ldi.la.gov/news/press-releases/4-3-23-press-conference-on-ldi-2023-legislative-package (last visited July 14, 2025).

various endorsements. The insurance program itself was administered by Velocity Claims, LLC ("Velocity"), which worked with Apex to complete the underwriting of the Policy and bind coverage with ISIC and Lloyd's. [ROA.25-30107.36, 179, 261.] To insure this roughly $4,000,000 commercial property risk, ISIC, a domestic surplus lines insurer, and Lloyd's, a foreign surplus lines insurer, agreed to participate in the Policy and allocate the risk 64% to ISIC and 36% to Lloyd's. [ROA.25-30107.92, ROA.25-30107.149.] Apex was fully informed of and agreed to these conditions and allocations prior to the inception of the Policy.

**B.    Apex's surplus lines Policy includes an Arbitration Agreement.**

The Policy includes an arbitration agreement in Section H of the Small Commercial Property Form, which states, in part:

4.  Arbitration Clause:

All matters in dispute between you [Apex] and us [ISIC and Lloyd's] (referred to in this policy as "the parties") in relation to this Insurance, including this policy's formation and validity, and whether arising during or after the period of this insurance, shall be referred to an Arbitration Tribunal in the manner described below.

* * *

Any Arbitration hearing shall take place in Nashville, Tennessee, unless some other locale is agreed by the Arbitrator or Arbitration Tribunal.

[ROA.25-30107.123-124.] Based on this provision (the "Arbitration Agreement"), the parties agreed to arbitrate all disputes, including any dispute as to whether the

matter is arbitrable. [*Id*.] In such a high-risk enterprise, arbitration under the Convention was a material benefit of the surplus lines Insurers' bargain with Apex.

### C. Apex made an insurance claim under the Policy to both Insurers but, later, only sued its domestic surplus lines insurer to circumvent the Convention.

After Hurricane Ida (August 29, 2021), Apex submitted an insurance claim to the Insurers under the Policy. [ROA. 25-30107.251.] ISIC and Lloyd's delegated claim-handling responsibilities to a single third-party administrator, Sedgwick Delegated Authority ("Sedgwick"). [ROA. 25-30107.36-43, 256.] Thus, Apex's insurance claims were handled by a single entity appointed jointly by the Insurers. Sedgwick, acting on behalf of *all* the Insurers, prepared the original estimates and net payments owed under the Policy for Apex's claim. [ROA.25-30107.256-263.] The undisputed insurance proceeds were issued to Apex in single financial instruments (checks) that were not separated out by insurer. [ROA.25-30107.40, 242.] Apex then disputed the claim payments and other determinations made by Sedgwick on behalf of both Insurers.

On December 29, 2022, when it became clear the parties were at an impasse, the Insurers, through their joint legal representation, invoked arbitration under the Policy to resolve the dispute between the parties: "…the Insurers wish to invoke the dispute resolution procedures provided for by the terms of the Policy and to demand arbitration as to all matters in dispute in relation to this claim." [ROA.25-30107.251-

253.] Even after the Insurers invoked arbitration, Sedgwick, on behalf of both Insurers, continued to adjust Apex's claims and demands.

On April 22, 2023, Apex filed suit in the 24th Judicial District Court for the Parish of Jefferson against ISIC. [ROA. 25-30107.32-48.] Apex asserted breach of contract claims and entitlement to bad faith damages under Louisiana law for ISIC's alleged failure to adequately compensate Apex for losses it claims are covered under the Policy. While the state court petition facially names and attributes wrongdoing only to ISIC, Apex alleges that its insurance claims were mishandled by Sedgwick— acting on behalf of both ISIC and Lloyd's—when it performed a cursory and inadequate investigation of the property covered by the Policy, grossly underreported the value of Apex's claim, and failed to adequately adjust or handle the loss, among other acts. [ROA. 25-30107.32-46.]

Apex did not sue Lloyd's, the foreign insurer, for these alleged acts and damage. Apex admitted that the reason it did not sue Lloyd's was to circumvent Lloyd's rights under international law or treaty to arbitration under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). [ROA. 25-30107.295-296.][2]

---

[2] "The Insured filed suit against only Independent Specialty Insurance Company … because it is a domestic insurance company that is *not subject to, or entitled to the benefits of, international law or treaty*. Notably, the Insured did not sue the other insurers underwriting the policies covering the subject property, Certain Underwriters at Lloyd's, London ("Underwriters"), *due to the arbitration clause contained within the international insurers' separate policy that is arguably enforceable under international law*." [ROA. 25-30107.295-296 (emphasis added).]

On June 14, 2023, the case was removed to the district court. [ROA. 25-30107.8.]

### D.   The district court wrongly vacated its original order compelling arbitration.

On July 12, 2023, ISIC filed a Motion to Compel Arbitration and Stay Litigation, arguing that the Policy's arbitration clause was valid and enforceable under the Convention. [ROA.25-30107.225-265.] Apex opposed the motion, arguing that Convention did not apply because ISIC and Lloyd's had separate contracts with Apex, and therefore, the contract between Apex and ISIC, a domestic insurer, could not fall under the Convention. [ROA.25-30107.295-442.]

On February 23, 2024, the district court granted ISIC's motion and compelled arbitration. [ROA.25-30107.450-458.] Finding that Apex alleged "substantially interdependent and concerted misconduct" by ISIC and Lloyd's, the district court held that Apex could be forced to arbitrate under the Convention through the doctrine of equitable estoppel as articulated by the Fifth Circuit in *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524 (5th Cir. 2000).

On November 26, 2024, Apex moved to lift the stay arguing that the Louisiana Supreme Court's answers to certified questions from the Western District of Louisiana in *Police Jury of Calcasieu Parish v. Indian Harbor Ins. Co.*, 2024-00449 (La. 10/25/24), 395 So.3d 717, was an intervening change in the controlling law that required a reversal of the prior order compelling arbitration. [ROA.25-30107.463-

476.] Apex argued that the Court held that (1) an insured may not be compelled to arbitrate in contravention of LA. REV. STAT. § 22:868 and (2) domestic insurers may not rely upon equitable estoppel to compel arbitration under the Convention.

ISIC opposed Apex's motion. [ROA.25-30107.486-503.] ISIC argued that, under the controlling Fifth Circuit precedent in *Bufkin Enterprises, L.L.C. v. Indian Harbor Ins. Co*., 96 F.4th 726 (5th Cir. 2024), Louisiana law, and specifically § 22:868, do "not come into play" and "is not a live issue in this dispute." *Id.* at 732-33. Pursuant to the binding Fifth Circuit precedent in *Bufkin*, this dispute is governed entirely by the Convention and federal equitable estoppel principles. Because a foreign insurer is involved "in the seamless coverage agreement struck by the parties… the arbitration agreement between the parties is subject to the Convention through equitable estoppel." *Id*. at 732-33. ISIC argued that since the relevant equitable estoppel principles in Convention cases are provided by federal common law, not state law, the Louisiana Supreme Court's decision in *Police Jury* is not controlling. ISIC argued that unless and until there is a contrary U.S. Supreme Cout decision or a contrary opinion from the Fifth Circuit *en banc*, the Fifth Circuit's binding precedent set forth in *Bufkin* requires that the district court's order compelling arbitration remain intact.

After oral argument on its motion to lift stay, Apex filed a supplemental brief asking the district court to follow two rulings by Judge Eldon Fallon in what Apex

argued were similar cases. [ROA.25-30107.557-579.] On January 17, 2025, Judge Fallon issued rulings in two cases, *Certain Underwriters at Lloyd's London v. Belmont Commons LLC, et al.*, No. CV 22-3874, 2025 WL 239087 (E.D. La. Jan. 17, 2025) and *Crescent City Surgical Operating Co. v. Certain Underwriters at Lloyd's, London, et al.,* No. 22-2625, 2025 WL 239404 (E.D. La. Jan. 17, 2025), in which he granted the insureds' motion to lift stay and vacate arbitration orders in cases involving a surplus lines insurance policy with domestic and foreign participating insurers.[3] In both cases, after determining that the foreign and domestic insurers issued separate policies, Judge Fallon ignored *Bufkin* and federal common law and held that the domestic insurers' arbitration agreements were not subject to the Convention. He concluded in both cases that the question of whether the domestic insurers could compel arbitration through equitable estoppel was governed by state law and, pursuant to the Louisiana Supreme Court decision in *Police Jury*, the domestic insurers could not compel arbitration through equitable estoppel.

On February 11, 2025, the district court granted Apex's motion to lift stay and vacate the arbitration order. [ROA.25-30107.637-641.], Citing the *Police Jury* decision and adopting Judge Fallon's analysis in *Belmont Commons, L.L.C.*, the district court held that a "domestic insurer may not resort to equitable estoppel to

---

[3] The insurers in those cases have appealed to this Court: *Indian Harbor Ins. Co., et al. v. Belmont Commons, L.L.C., et al.*, No. 25-30047 (5th Cir.) and *Crescent City Surg v. Interstate Fire*, No. 25-30044 (5th Cir.).

enforce arbitration." [ROA.25-30107.640.] The district court held that "*Police Jury*

conclusively establishes that Louisiana Revised Statute § 22:868 [sic] invalidates

arbitration agreements in insurance contracts;" "domestic insurers [in Louisiana] can

no longer be subject to the Convention through equitable estoppel;" "that whether a

plaintiff can be compelled to arbitrate with a domestic insurer based on the plaintiff's

arbitration agreement with a foreign insurer is a matter of state law, not federal law;"

and "*Police Jury*. . . represents an intervening change in the controlling law." [*Id.*]

This appeal followed.

## IV.   SUMMARY OF THE ARGUMENT

The Arbitration Agreement between the parties in this surplus lines Policy

should be enforced under the Convention because it (1) "is an agreement in writing

to arbitrate" the claims asserted by Apex; (2) provides for arbitration in Tennessee

(within the "territory of a Convention signatory"); (3) "arises out of a commercial

legal relationship"; and (4) has "a party to the agreement [that] is not an American

citizen" because the foreign insurer, Lloyds, is a party to the Policy and the

Arbitration Agreement along with ISIC, the domestic insurer. *Francisco v. STOLT

ACHIEVEMENT MT*, 293 F.3d 270, 273 (5th Cir. 2002). Because the enforcement

of the Convention entails the application of a treaty and the federal statutes

implementing it, federal law, and not Louisiana law, governs the contractual

interpretation of the Policy. *See Nehme v. Immigr. & Naturalization Serv.*, 252 F.3d

415, 422 (5th Cir. 2001). "Congress does not make the application of a federal act dependent on state law." *Id*.

Further, even accepting the district court's erroneous conclusion that the Insurers' contracts are all separate, the doctrine of equitable estoppel would still mandate arbitration under the Convention. The Court's recent holding in *Bufkin* is dispositive. *Bufkin* involved the same arbitration language, the same relevant law, and the same issues in dispute, and this Court held that the Convention required the district court to compel arbitration even though the plaintiff had dismissed the foreign surplus lines insurers. 96 F.4th at 729. *Bufkin*, moreover, correctly recognized federal law governs the application of equitable estoppel to enforce the Convention, and rejected the argument that Louisiana state law, namely LA. REV. STAT. § 22:868, invalidates arbitration agreements subject to the Convention.

## V.    STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of a motion to compel and refusal to stay proceedings pending arbitration. *Bufkin*, 96 F.4th at 729. A district court's decision not to enforce an arbitration agreement through equitable estoppel is reviewed for abuse of discretion. *Id*. "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." *Id*.

## VI.    LAW AND ARGUMENT

This is another in a series of cases where a district court has vacated its own order to enforce an Arbitration Agreement in a surplus lines insurance policy despite it being required to order arbitration under the insurance policy's plain text and a federal treaty. Here, the district court compelled arbitration but later vacated that order because it erroneously found that the Louisiana Supreme Court's decision in *Police Jury of Calcasieu Parish v. Indian Harbor Ins. Co.*, 2024-00449 (La. 10/25/24), 395 So.3d 717, is an intervening change in the controlling law. This Court should reverse the district court's order granting Apex's motion to lift stay and vacate arbitration order and compel arbitration.[4]

---

[4] Surprisingly, on July 2, 2025, this same district court has perhaps already acknowledged that it's ruling vacating the arbitration order in this case was premature and in error. In *Brundage Mgmt. Co., Inc. v. Certain Underwriters Lloyd's London, et al.*, No: 22-3780 (E.D. La. 7/2/2025) (Milazzo, J.), The district court denied the plaintiff's Motion to Reconsider/Set Aside Prior Order Granting Motion to Stay Proceedings and Compel Arbitration on the grounds that the stay should remain intact pending disposition of cases before this Court addressing these same issues, i.e., this case, *Police Jury of Calcasieu Parish v. Indian Harbor Ins. Co,* Case No. 24-30696 (5th Cir.), or *Town of Vinton v. Indian Harbor Ins. Co.,* No. 24-30035 (5th Cir.). the court recognized that the pending appeals before this Court "raise questions whose answers will address and guide the Court's ruling on the instant Motion, including how to properly construe a surplus-line insurance policy providing coverage issued by both foreign and domestic insurers and whether domestic insurers may invoke equitable estoppel to compel arbitration under the Convention." It also cited to a pattern of other judges in the district maintaining stays in similar cases while this Court resolves these issues. *See 8692 River Road, LLC v. Certain Underwriters at Lloyd's, London*, No. 23-6973, Doc. 46 at 3 (Long, J.) (*citing Southland Square Apart., LLC v. Certain Underwriters at Lloyd's, London*, 23-CV-2329, 2024 WL 5086081, at *3 (E.D. La. Dec. 12, 2024) (Barbier, J.)); *see also Woo Kee Trading, Inc. v. Certain Underwriters at Lloyd's, London*, No. 23-6523, Doc. 27 at 3 (Long, J.); *Parish of St. Charles v. HDI Global Spec. SE*, No. 22-3404, 2025 WL 1142397, at *2 (E.D. La. Apr. 17, 2025) (Ashe, J.).

The clearest path to reversal is to apply the Convention and its implementing federal law (9 U.S.C. § 201, *et seq.*). In general, that treaty requires arbitration agreements contained in any commercial agreement including a foreign party to be enforced. This case presents an opportunity for the Court to reiterate that (1) arbitration agreements that involve foreign parties are covered by the Convention and (2) are enforceable regardless of state law to the contrary because the Convention supersedes any conflicting state law. To hold otherwise, would disregard this Nation's obligations under the Convention and invites a flurry of federal litigation in cases that were intended by all parties to be arbitrated.

But the plain text of the Convention is not the only path to enforcement here. In addition, this Court's binding decision in *Bufkin* also controls. That case, which reversed a district court's denial of arbitration in substantively identical circumstances, controls because the federal common law doctrine of equitable estoppel mandates the Convention's enforcement.[5] Finally, this Court could also reverse by holding that Apex's challenges to the arbitration provision's

---

[5] Two district courts recently accepted this argument in evaluating identical arbitration agreements between Louisiana entities and surplus lines insurers. *See Arrive NOLA Hotel, LLC v. Certain Underwriters at Lloyds, London*, No. CV 24¬1585, 2025 WL 871608, at *1 (E.D. La. Mar. 20, 2025); *Parish of Lafourche v. Indian Harbor Ins. Co.*, Nos. 24-3479, 24-3475, 2025 WL 754333, at *1 (E.D. La. Mar. 10, 2025). In both cases, the district court ultimately determined that a straightforward application of *Bufkin* compelled arbitration regardless of the Louisiana Supreme Court's recent statements of Louisiana law. This Court should reach the same conclusion.

enforceability were delegated to the arbitration tribunal. In all events, the Arbitration Agreement must be enforced.

## A. The Convention required the district court to enforce the Policy's Arbitration Agreement.

The analysis in this case should start and stop with the text of the Convention. A straightforward textual application of the Convention to the Arbitration Agreement in the Policy required the district court to grant the motion to compel and stay the proceedings, and it should have never vacated those orders. Here, there is only one Arbitration Agreement at issue in this case, and it includes foreign parties. Apex, to secure the best pricing and coverage for its properties, signed that Arbitration Agreement with a domestic and foreign surplus lines insurer. It cannot change course now that it finds those obligations inconvenient.

### 1. The Convention is a federal treaty implemented by federal statute and preempts all relevant state law.

The Convention is an international treaty that guarantees citizens of signatory countries the right to enforce agreements to arbitrate disputes. This treaty is the law of the land and preempts all relevant state law. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 art. II(3), 21 U.S.T. 2517, 1970 WL 104417, at *1. The "goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in

14

international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 520 n.15 (1974).

The Convention Act, the federal law implementing the Convention housed in Chapter 2 of the Federal Arbitration Act ("FAA"), provides that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial…falls under the Convention" if the relationship is not "entirely between citizens of the United States." 9 U.S.C. § 202. Chapter 2 of the FAA further provides that an "action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203.

In this highly federalized area, state law "does not control the resolution of issues governed by federal statute" or treaty, *Franco v. Mabe Trucking Co*., 3 F.4th 788, 798 (5th Cir. 2021), and Congress plainly intends that the Convention and Chapter 2 of the FAA "have nationwide application." *Nehme v. Immigr. & Naturalization Serv.,* 252 F.3d 415, 422 (5th Cir. 2001). Likewise, the Convention and Chapter 2 of the FAA contain no suggestion that Congress "[made] the application of [these] federal act[s] dependent on state law." *Id.*[6] This Court has long held that

---

[6] A leading treatise on contract law summarizes, "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards and the implementing provisions of the FAA create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the

the Convention supersedes any conflicting state law, as the McCarran-Ferguson Act does not apply to treaties like the Convention. *See Bufkin,* 96 F.4th at 732; *Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,* 587 F.3d 714, 718, 721-25, 729-32 (5th Cir. 2009) (*en banc*). [7] Accordingly, issues concerning the formation or interpretation of international arbitration agreements covered by the Convention and Chapter 2 of the FAA are governed by federal law, not state law.

> **2.    The Convention directly applies because the Arbitration Agreement meets all the requirements for enforcement under the Convention.**

There is a strong presumption in favor of arbitrations that fall under the Convention, and the Court's inquiry into a motion to compel arbitration is limited. There are four factors that must be met to compel arbitration under the Convention:

1.    There is a written agreement to arbitrate the matter;

---

coverage of the Convention." And, "[g]eneral federal law, rather than the state law of the forum and its conflict of laws rules, governs the question whether an agreement to arbitrate was made." 21 Richard A. Lord, *Williston on Contracts* § 57:61 (4th ed. 2024) (footnotes omitted). Thus, under the Convention, The Ninth Circuit has held: "Because this case arises under Chapter 2 of the Federal Arbitration Act, the issue of whether the Commercial Contract constituted a binding agreement is governed by federal common law." *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC,* 816 F.3d 1208, 1211 (9th Cir. 2016). So has the Second Circuit: "When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable." *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 96 (2d Cir. 1999), abrogated on other grounds by *Granite Rock Co. v. Int'l Bd. of Teamsters,* 561 U.S. 287, 296 (2010).

[7] These holdings are consistent with the "strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions" that "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 631 (1985).

2.      The agreement provides for arbitration in a Convention signatory nation;

3.      The agreement arises out of a commercial legal relationship; and

4.      A party to the agreement is not an American citizen.

*Bufkin,* 96 F.4th at 730; *see also Freudensprung v. Offshore Tech. Servs.*, 379 F.3d 327, 339 (5th Cir. 2004). Here, the Convention requires arbitration because all these factors are plainly met.[8]

First, the Arbitration Agreement is an enforceable, written agreement to arbitrate. No one, not even Apex, has asserted that there is no written agreement to arbitrate, thus, the first prong is met. Second, the Arbitration Agreement provides for arbitration in Tennessee, which is within the territory of a Convention signatory, *i.e.*, the United States.[9] [ROA.25-30107.124.] Third, the Arbitration Agreement is contained in an insurance contract between sophisticated entities and provides coverage for a commercial property operated as a 73-room Comfort Inn franchise hotel. Thus, this agreement clearly arises out of a commercial legal relationship.[10]

Lastly, a party to the Arbitration Agreement, Lloyd's, is not an American citizen. To fail prong 4 of this test, the commercial relationship must be "entirely

---

[8] In fact, the district court originally held that all these factors were met when it ordered arbitration. ROA.25-30107.452.

[9] The United States ratified the Convention in 1970, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38, reprinted following, 9 U.S.C. § 201 (West Supp. 1998).

[10] In *Bufkin*, this Court concluded that a surplus lines insurance policy for an apartment complex meant that the arbitration agreement in the policy arose out of a commercial legal relationship. 96 F.4th at 730.

between citizens of the United States." 9 U.S.C. § 202. Here, Lloyd's is partially comprised of Syndicate 1458, whose sole member is RenaissanceRe Corporate Capital (UK) Limited, a private limited company incorporated under the Laws of England and Wales with its principal place of business in England and Wales. [ROA.25-30107.15, 185-187, 240.]

Therefore, the Convention applies by its text alone, and the order compelling arbitration should be reinstated.

> **3.    Under federal law, the Policy is one agreement to which all the Insurers—domestic and foreign—are parties, and all the Insurers and Apex collectively agreed to its Arbitration Provision.**

As part of Apex's efforts to circumvent the Convention, it has argued that ISIC, as the domestic insurer, and Lloyd's, as the foreign insurer, issued separate policies of insurance covering Apex's property and, thus, have separate arbitration agreements.[11] Its position betrays an imperfect understanding of how this surplus lines insurance Policy is structured. The district court erroneously accepted Apex's framing that there were separate contracts between Apex and the Insurers. This ruling clashes with both the Policy language and structure, the Arbitration Agreement itself, and the statutory text of § 202.

---

[11] ROA.25-30107.33. ("Defendant and Certain Underwriters at Lloyd's, London ("Underwriters") issued separate policies of insurance covering the Property against all perils, including hurricane, wind, wind-driven rain, and water, with an effective date July 19, 2021, to July 19, 2021 ("Policies"). Defendant's policy was identified by Policy No. VVX-CU-803800-01 and Underwriters' policy was identified by Policy No. VRR-CU-803800-01.")

*The Policy Itself*

Federal common law controls this issue, and, under its principles, this surplus lines Policy is a "seamless coverage agreement struck by the parties"—not multiple separate contracts. *Bufkin*, 96 F.4th at 732. The Policy is structured as one overall policy that contains component coverage parts supplied by the participation agreements from each Insurer, with each Insurer being severally obligated for the component coverage part it has underwritten. But the Policy is still *one* agreement to which all the Insurers—domestic and foreign—are parties.

Apex's entire framing and understanding of the Policy is incorrect. While perhaps slightly rudimentary, according to the General Property Policy Declarations Page, there is only *one* Policy number—No. 2021-803800-01—not multiple numbers as Apex suggests. [ROA.25-30107.87.] In all of the claims correspondence, it is this *one* Policy number that is used when referring to the Policy. [ROA.25-30107.250-261.] Even Apex's own counsel uses this *one* Policy number in its claims correspondence. [ROA.25-30107.254.] ISIC and Lloyd's, based on their participation in the Policy, also have "Carrier Policy ID" numbers for their internal record keeping, which were VVX-CU-803800-01 for ISIC and VRR-CU-803800-01 for Lloyd's. [ROA.25-30107.87.] These Carrier Policy ID numbers are not separate policy numbers.

19

Apex then misinterprets the Allocation Endorsement's language that the policy must be "constructed" as separate contracts with each insurer. [ROA.25-30107.149-150.] All the Insurers and Apex are collectively agreeing to in this endorsement is a contractual provision specifying how the overall Policy is to be interpreted and identifying the Insurers maximum limit of liability under the Policy. *There is no separate contract signed or entered into based on this endorsement*. That provision's purpose is to show that the Insurers intended that their maximum limit of liability to Apex under the Policy is several and based on the agreed-upon participation of each Insurer as a percentage of the total limits of liability.

To reinforce that each Insurer bears several liability under "this Policy" for its own coverage part, the Allocation Endorsement provides that:

> The Insurer's liability under *this policy* for covered losses is several and not joint with other insurers party to this contract. The Insurer is liable only for the proportion of liability it has underwritten. The Insurer is not jointly liable for the proportion of liability underwritten by any other insurer. Nor is the Insurer otherwise responsible for any liability of any other insurer that may underwrite *this policy*.

[ROA.25-30107.149 (emphasis added).] This Allocation Endorsement is not a separate contract, nor does it create one, it merely places all parties to the Policy on notice of the several liability of the surplus lines Insurers and the maximum limits of that several liability under the Policy terms and conditions.

The Allocation Endorsement memorializes and specifies the agreement that the respective insurers participate only to a maximum limit of liability as stated in

the Table on the endorsement. The provision is meant only to refer to the "Contract" column in the Table, and even then, that Contract Number reference is only relevant for internal accounting and regulatory purposes—it is *not* a separate contract. The way this surplus lines Policy works is that there is only one contract of insurance made up of general terms and conditions and then clarifying endorsements. The document that describes and defines all the Policy's coverages, terms and conditions, and exclusions, that Apex and the Insurers agreed upon, is the Small Commercial Property Form. [ROA.25-30107.97-136.] Then, through the Allocation Endorsement, the two surplus lines carriers (ICIS and Lloyd's) state their respective participations and maximum limits of liability for specified coverages. ISIC agreed to "participate" at a maximum level of liability of 64% for all covered causes of loss and 100% level of liability for equipment breakdown coverage. Lloyd's agreed to "participate" at the remaining maximum level of liability of 36% for all covered causes of loss. These participation allocations are reflected by the details and numbers in the Table.

Apex is misconstruing the participation allocations as separate contracts. The Allocation Endorsement does nothing more than place all parties to the Policy on notice that the participating insurers, ISIC and Lloyds, have different obligations to Apex vis-à-vis their limits of liability under the Policy. The endorsement is not creating separate contracts, it is merely acknowledging and providing notice to the

insured that the insurers participate on a several liability basis, as specified in their respective participating percentages.

That the Allocation Endorsement merely confirms the several liability and the maximum limit of liability is further proven by the last paragraph of the endorsement. The final text of the endorsement refers in the singular to "this policy" and states that "[a]ll other terms and conditions, Named Insured coverage and exclusions of this policy remain unchanged… and apply in full force and effect…" [ROA.25-30107.150.] The argument being that there is a clear distinction between participation allocations that define the scope of each insurers' several liability and the overall terms and conditions of "this policy" (which remain unchanged and apply in full force and effect).

Other provisions of the Policy likewise evidence the Insurers' collective agreement to contractual terms. For example, the Several Liability Clause endorsement echoes the Allocation Endorsement's language that each Insurer is severally liable for only its component coverage part within the one Policy. [ROA.25-30107.147.] And, this endorsement also includes the important language that "[a]ll other terms and conditions, Named Insured coverage and exclusions of this policy remain unchanged… and apply in full force and effect…" [*Id.*]

The Policy's terms providing it is one overall policy in which each Insurer bears several liability for its own component coverage part is entirely congruent with

federal common law. The principles of federal common law are "[o]ften ... found in the Restatement (Second) of Contracts," *Casa del Caffe,* 816 F.3d at 1212; *see Wallach v. Eaton Corp.,* 837 F.3d 356, 367 (3d. Cir. 2016), and, as highly relevant here, the Restatement provides that "[a] contract may consist of a single promise by one person to another, or of mutual promises by two persons to one another; or there may be, indeed, any number of persons or any number of promisees." *Restatement (Second) of Contracts § 1* cmt. c (1981); *see id.* § 9 cmt. c (illustrating same principle); *Shea v. McCarthy,* 953 F.2d 29, 31 (2d Cir. 1992) ("It is recognized in the common law that a single contract may be a complex transaction involving multiple promisors and multiple promisees."). And, as a leading treatise provides, "[a] several obligation ... has the effect of creating two separate liabilities on *a single contract."* 12 Lord, *Williston on Contracts* § 36.1 (emphasis added)); *see also Adriatic Fire Ins. Co. v. Treadwell,* 108 U.S. 361, 365 (1883) (describing companies' several liability as all being under one contract or agreement); *Restatement (Second) of Contracts* § 288 ("Where two or more parties to a contract make a promise or promises to the same promise, the manifested intention of the parties determines whether they promise that the same performance or separate performances shall be given.").

The Policy squarely meets these principles. It is a single overarching contract in which there are also several component coverage parts. *See Restatement (Second)*

*of Contracts* § 1 cmt. c. The provision that "[t]his contract shall be constructed as a separate contract between [Apex] and each of the Insurers" does not mean the Policy is not a single agreement and is instead only separate contracts. [ROA.25-30107.150.] Rather, it merely shows that the Insurers intended that their respective obligations to Apex contained within the Policy be several.

### The Arbitration Agreement

Under no circumstances could the Arbitration Agreement be considered a separate agreement nor is there any language anywhere in the Policy suggesting it should be "constructed" or interpreted as a separate agreement. The Arbitration Agreement appears in the Small Commercial Property Form where all general terms and conditions of the Policy are contained and in which the Insurers are referred to collectively. [ROA.25-30107.123-124.] And the Arbitration Agreement expressly defines "the parties" to the Arbitration Agreement as "you and *us.*" [ROA.25-30107.123 (emphasis added).] The agreement's use of the first-person plural pronoun "us" clearly shows that that the Arbitration Agreement is a single agreement between Apex and *both* Insurers.

There is no language in the Allocation Endorsement that relates to, let alone changes in any way, the Arbitration Agreement. To the contrary, the Allocation Endorsement clearly confines its subject matter to the "participation of each Insurer(s) as a percentage (%) of the limit of liability shown in the policy…" In fact,

the Allocation Endorsement specifically contradicts such a broad, overreaching conclusion when it provides that all other terms of this Policy remain unchanged:

> All other terms and conditions, Named Insured coverage and exclusions of this policy remain unchanged, including applicable limits, sublimits and deductibles, and apply in full force and effect to the coverage provided by this policy.

[ROA.25-30107.149.] If the Allocation Endorsement were intended to affect and separate every term, condition, coverage, exclusion, limit, sublimit, and deductible into "separate" contracts, there would be no need for this language. Indeed, the Arbitration Agreement is a "condition" contained in "this policy," specifically, within the Small Commercial Property Form.

A leading treatise on international commercial arbitration agrees, explaining that an agreement to arbitrate is "separable" from the "underlying contract" and "the parties' intentions ... will often be different with regard to their arbitration agreement ... than with regard to their underlying commercial contracts." *See* 1 Born, *International Commercial Arbitration* § 10.03, p. 1602. Thus, "there will readily be cases where the parties desire a unified, `one-stop' dispute resolution mechanism, particularly one extending to all members of a corporate group involved in a particular transaction, without altering the allocations of substantive contractual rights contained in the underlying contracts." *Id.* Therefore, at the very least, all the Insurers agreed to the Arbitration Agreement at issue here.

By the Allocation Endorsement's clear and unequivocal language, it cannot be interpreted or applied to change the Arbitration Agreement between the parties.

As a result, there is no basis to find that the Arbitration Agreement is rendered "separate" arbitration agreement*s* under the Allocation Endorsement, and it must instead be applied as it was written into existence—as a single agreement among the parties involved in the seamless coverage arrangement. The Arbitration Agreement is governed by the Convention and thus all parties—Apex and all Insurers participating in the Policy—must resolve their claims in arbitration.

### *§ 202 of the FAA*

If the phrase "entirely between American citizens" in § 202 is to mean anything, it must mean that a composite surplus lines insurance policy collectively agreed to by domestic and foreign insurers—even one with insurer-specific coverage participation subparts—is covered by the Convention. Since this Arbitration Agreement involves a foreign party and signatory, it, therefore, falls under the Convention by virtue of § 202.

If any questions remain about the Convention's application, controlling precedent dictates that any uncertainty be resolved in favor of the Convention's applicability. There is "a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions" that "applies with special force in the field of international commerce." *Mitsubishi Motors,* 473 U.S. at 628-29, 631; *see Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG,* 783 F.3d 1010, 1015-16 (5th Cir. 2015) (citing *Mitsubishi Motors*). This Court has instructed

as well that "doubts as to whether a contract falls under the Convention Act should be resolved in favor of arbitration." *Francisco,* 293 F.3d at 274-75.

**B.     Even if the ISIC's contract is considered separate, equitable estoppel would still mandate arbitration under the Convention.**

If the Court is experiencing déjà vu, that is because it has already addressed these issues. In the wake of Hurricane Laura, a 2020 storm that caused substantial damage to Calcasieu Parish, the insured in a surplus lines insurance policy issued by ten insurers—eight domestic and two foreign—tried to circumvent the Convention through clever pleading strategies and was stopped by this Court. Now, after Hurricane Ida made landfall a year later, Apex has repackaged all the same arguments and theories this Court already addressed and rejected in *Bufkin.*

**1.     *Bufkin's* compelling arbitration under the Convention through federal equitable estoppel is dispositive of this case.**

Even accepting the theory that the Insurers' contracts are all separate, the doctrine of equitable estoppel under federal law still mandates arbitration under the Convention. In *Bufkin,* this Court reversed a district court's failure to compel arbitration after holding that an identical arbitration agreement in a substantively identical surplus lines policy must be enforced through the Convention and equitable estoppel under federal law. *Bufkin,* 96 F.4th at 729-33. This Court, applying its decision in *Grigson,* held that equitable estoppel required the district court to compel

arbitration under the Convention *regardless* of whether the policy was composed of a single contract or multiple contracts. *Bufkin,* 96 F.4th at 731.

This Court identified two equitable estoppel scenarios that allow a non-signatory to a contract with an arbitration clause to compel arbitration with a signatory. *Bufkin*, 96 F.4th at 731 (citing *Grigson,* 210 F.3d at 527-28). The first scenario did not apply in *Bufkin*, nor does it apply here. The second scenario, which was applicable in *Bufkin* and is here, is when a signatory to a contract containing an arbitration clause raises allegations of substantially "interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Id.*

*Bufkin's* analysis focused primarily on whether arbitration under the Convention was warranted through equitable estoppel based on the insured's allegations of substantially interdependent and concerted misconduct by both the domestic insurers and the foreign insurers. The facts the Court identified as dispositive were: (1) Bufkin's allegations of substantially interdependent and concerted conduct as to both the foreign and domestic insurers; (2) Bufkin's failure to identify any "wholly separate" conduct on the part of the foreign or domestic insurers; and (3) Bufkin's submission of its insurance claim to *all* insurers, foreign and domestic. *Id.* at 730-33.

Like the plaintiff in *Bufkin*, Apex alleged "substantially interdependent and concerted conduct by the domestic and foreign insurers" and failed to "differentiate between conduct of foreign and domestic insurers." *Id.* at 731. Apex submitted its original claim notice to *all* the insurers via Velocity. [ROA.25- 30107.179.] Apex's subsequent communications were with *all* the Insurers or Velocity or Sedgwick, who was the third-party administrator for Velocity, both of which were acting on behalf of *all* the Insurers. [ROA.25-30107.256.] And Sedgwick—acting on behalf of *all* the Insurers—prepared the original estimates and net payments owed under the one Policy for Apex's claim. [ROA.25-30107.256-263.] Then, the undisputed insurance proceeds were collectively and simultaneously issued to Apex in *single* financial instruments (checks) that were not separated out by insurer. [ROA.25-30107.40, 242.] Apex then disputed the claim payments and other determinations made by Sedgwick on behalf of both Insurers. Once an impasse was reached, the Insurers, through their joint legal representation, invoked arbitration under the Policy to resolve the dispute between the parties. [ROA.25-30107.251-253.]

Indeed, the district court acknowledged in its original order compelling arbitration, finding that Apex "failed to differentiate purported wrongful conduct by the Insurers and therefore charges them with conduct that was 'interdependent and in concert' in connection with their handling of [Apex's] insurance claims." [ROA.25-30107.454, 456.] Therefore, even if the Insurers' contracts with Apex were

found to be separate contracts, and somehow the Convention does not directly apply, Apex has "raise[d] allegations of substantially interdependent and concerted misconduct by both the domestic Insurers and the foreign Insurers" that would make the Convention applicable to ISIC's arbitration agreement by virtue of equitable estoppel. *Bufkin*, 96 F.4th at 731 (quotation omitted); *see also LMP Props., L.L.C. v. Interstate Fire & Cas. Co.*, No. 23-30833, 2024 WL 2988938, at *1 (5th Cir. June 14, 2024) (unpublished) (*per curiam*) (following *Bufkin* in similar case and holding that the "Convention applies despite Appellees' dismissal of claims against the foreign insurers.").

> ### 2. *Bufkin* correctly recognized that federal common law, not state law, governs equitable estoppel under the Convention.

The Court in Bufkin expressly rejected Bufkin's contention that enforcing the Convention through equitable estoppel "run[s] against Louisiana public policy." *Bufkin*, 96 F.4th at 732. The Court explained that the "Convention is an exception to Louisiana's general bar on policy terms that deprive its state courts of jurisdiction and venue in actions against insurer" and that, in *Safety National*, the Court "already held that § 22:868 does not reverse preempt the Convention because the McCarran-Ferguson Act does not apply to treaties." *Id.* (*citing Safety Nat'l*, 587 F.3d at 718). "In other words, § 22:868 does not come into play." *Id.*

The Court's equitable estoppel analysis rested on *Grigson,* a case that applied equitable estoppel under federal common law. *See Grigson,* 210 F.3d at 527-28. The

*Bufkin* Court discussed Louisiana case law applying *Grigson*, but its holding was based on *Grigson* alone: "The district court failed to apply *Grigson's* 'interdependent and concerted misconduct' test," and "[t]his was an abuse of discretion." *Bufkin,* 96 F.4th at 733 (citing *Grigson,* 210 F.3d at 528).[12] The *Bufkin* Court further emphasized that, "[h]aving resolved this appeal on *Grigson* estoppel grounds, § 22:868's impact *is not a live issue in this dispute*." 96 F.4th at 733 (emphasis added).[13]

In contrast to the federal equitable estoppel applied in *Bufkin*, the question certified to the Louisiana Supreme Court in *Policy Jury* regarding equitable estoppel specifically asked whether Louisiana state law permitted an insurer to use equitable estoppel to enforce an arbitration provision in another insurer's policy, and the

---

[12] *See Parish of Lafourche,* Civ. A. No. 23-3472 c/w 23-3479, 23-3475, 2025 WL 754333, at *4 (E.D. La. 3/10/2025) (Morgan, J.) *("Bufkin* instructs district courts to apply federal common law equitable estoppel to compel domestic insurers to arbitrate...."), *Arrive Nola Hotel, LLC v. Certain Underwriters at Lloyds, London,* Civ. A. No. 24-1585, 2025 WL 871608, at *4 (E.D. La. 3/20/2025) (Brown, C.J.) (same); *Olsen Sec. Corp. v. Certain Underwriters at Lloyd's London*, No. CV 22-3120, 2025 WL 1370445, at *7 (E.D. La. May 12, 2025) (Brown, C.J.) ("According to Bufkin, federal equitable estoppel principles allow domestic insurers to compel arbitration when their foreign counterparts compel arbitration under the Convention and there exists allegations of concerted and interdependent conduct. Based on this Court's finding that concerted and interdependent conduct was alleged, arbitration can properly be compelled by both the domestic and foreign insurers who issued the Policy to Plaintiffs.").

[13] Further, in support of its equitable estoppel analysis, the Court also cited its decision in *Brown v. Pacific Life Insurance Co.,* 462 F.3d 384 (5th Cir. 2006), which followed *Grigson* and analyzed equitable estoppel as a matter of federal law. *See Bufkin,* 96 F.4th at 731 n.4; *Brown,* 462 F.3d at 398-99. This citation would make no sense if the Court were applying equitable estoppel under Louisiana law. Moreover, the Louisiana cases cited by the Court involved applications of *Grigson. See Pontchartrain Nat. Gas. Sys. v. Tex. Brine Co.,* 317 So.3d 715, 743-45 (La. Ct. App. 2020); *Sturdy Built Homes, L.L.C. v. Carl. E. Woodward L.L.C.,* 82 So.3d 473, 478 (La. Ct. App. 2011).

Louisiana Supreme Court's opinion accordingly only discussed equitable estoppel under Louisiana law. *Police Jury*, 395 So.3d at 722, 728-30. The Louisiana Supreme Court's decision in *Police Jury* clarified application of LA. REV. STAT. § 22:868 pursuant to Louisiana law. While the Louisiana Supreme Court in *Police Jury* disagreed with the Fifth Circuit's application of federal common law estoppel in *Bufkin*, this Court is not bound by *Police Jury* on matters of federal common law or the Convention. Given the uniquely federal interest in matters involving the Convention and no intervening Fifth Circuit decision, the Court remains bound by the Fifth Circuit's application of *Grigson* estoppel under the Convention in *Bufkin*.

The *Bufkin* Court's application of equitable estoppel under federal common law was entirely correct. In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Supreme Court stated a two-part test for determining whether federal common law should apply over state law." O*utokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, (11th Cir. July 8, 2022), 2022 WL 2643936, at *6 (Tjoflat, J., concurring). First, the court must determine whether "uniquely federal interests" are involved. *Boyle*, 487 U.S. at 504, 507; *see Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). Second, the court must determine whether a "significant conflict exists between an identifiable federal policy or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation." *Boyle*, 487 U.S. at 507 (alteration in original)

(quotation omitted). Sometimes, such as "where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules." *Id.*; *see also La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 301 (5th Cir. 2000) ("Courts create federal common law when it is necessary to effectuate the intent behind a federal statute").

Here, issues concerning the formation and interpretation of arbitration agreements under the Convention easily meet each part of the *Boyle* test. As to the first part, issues concerning the formation and interpretation of arbitration agreements under the Convention present a "quintessential 'uniquely federal interest.'" *Outokumpu*, 2022 WL 2643936, at *6 (Tjoflat, J., concurring) (quoting *Boyle*, 487 U.S. at 507). As the Supreme Court explained long ago, the purpose of the United States adopting and implementing the Convention was "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk*, 417 U.S. at 520 n.15. The Court has further explained that, in applying the Convention, "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context."

*Mitsubishi Motors*, 473 U.S. at 629. "A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate" the purposes of the Convention but would also "invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." *Scherk*, 417 U.S. at 516-17. Indeed, "there is a strong federal interest in making sure that the United States lives up to its treaty obligations." *Outokumpu*, 2022 WL 2643936, at *6 (Tjoflat, J., concurring). The application of the Convention and Chapter 2 of the FAA in courts across the country thus involve a "uniquely federal interest." *Boyle*, 487 U.S. at 507.

This Court, in prior decisions, has echoed the importance of a uniform body of law for Convention arbitration agreements. As this Court explained, "[t]o gain rights under the Convention, ... Congress had to guarantee enforcement of arbitral contracts and awards made pursuant to the Convention in United States courts." *McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1207 (5th Cir. 1991). This Court also agreed that a reason "Congress favored federal jurisdiction over Convention-related claims" was "to promote the development of a uniform body of law under the Convention." *Beiser v. Weyler*, 284 F.3d 665, 672 (5th Cir. 2002) (*citing McDermott*, 944 F.2d at 1212).

For the second part of the Boyle test, a "significant conflict" between federal common law and state law exists because uniformity in interpreting arbitration

agreements, including arbitrability, falling under the Convention is a critical element of the Convention and Chapter 2 of the FAA and the "application of state law would frustrate" that uniformity. *Id*. "A central goal of the Convention—and the driving force behind Congress's enactment of chapter 2—was to set out uniform rules governing the recognition and enforcement of international arbitration awards," and "[a]pplying varying state standards in cases falling within the Convention's ambit would be in tension with the elemental purpose of chapter 2." *InterGen N.V. v. Grina*, 344 F.3d 134, 143 (1st Cir. 2003); *see Outokumpu*, 2022 WL 2643936, at *6 (Tjoflat, J., concurring) ("[A]llowing each state ... to impose its own test for threshold questions of arbitrability would create an unmanageable tangle of arbitration law in the United States, lead to forum shopping, and frustrate the uniform standards the New York Convention and Chapter 2 of the FAA were enacted to create."). As this Court has explained, "[r]efusing to apply state law is appropriate when national uniformity is required, as well as when state law conflicts with federal interests." *Cent. Pines Land Co. v. U.S.*, 274 F.3d 881, 890 (5th Cir. 2001) (footnotes omitted); *see also Mangaroo v. Nelson*, 864 F.2d 1202, 1205 n.3 (5th Cir. 1989) ("Whether equitable estoppel will lie in an action based upon federal law, is a question to be determined with reference to the federal law of estoppel.").

Here, there is a "significant conflict" that exists between the provisions of the Convention and Chapter 2 of the FAA demanding that arbitration agreements be

enforced and the anti-arbitration provisions contained in LA. REV. STAT. § 22:868. *See Boyle*, 487 U.S. at 507. As a result, these anti-arbitration "elements of [the state statutes] are superseded." *Id*. Thus, under the *Boyle* test, whether non-signatories of an arbitration agreement may enforce the Convention through equitable estoppel is an issue of contractual formation and interpretation that is governed by federal common law.

Nor is this Court's conclusion that federal common law governs equitable estoppel under the Convention affected by the Supreme Court's decision in *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432 (2020), as Apex may argue. In *GE Energy*, the Court reversed a decision of the Eleventh Circuit holding that the Convention could only be enforced by parties that signed the arbitration agreement, and that the Convention could not be enforced by non-signatories through equitable estoppel. *Id*. at 439-41, 445. The Supreme Court's opinion was limited, however, as it "[held] only that the New York Convention does not conflict with the enforcement of arbitration agreements by non-signatories under domestic-law equitable estoppel doctrines." *Id*. at 445. The Court expressly stated that it was not determining "which body of law governs" the application of equitable estoppel and that issue "can be addressed on remand" by the Eleventh Circuit. *Id*. Whether federal or state law governs the application of equitable estoppel was therefore simply not decided in *GE Energy*. *See Jiangsu*

*Beier Decoration Materials Co. v. Angle World LLC*, 52 F.4th 554, 562 n.32 (3d Cir. 2022) (stating that *GE Energy* Court "declined to determine which body of law courts should apply" for equitable estoppel under the Convention (quotation omitted)); 1 Born, *International Commercial Arbitration* § 10.05[A], p. 1610 n.492 (describing the *GE Energy* Court as "leaving open question of which body of law governs application of non-signatory theory" (quotation omitted)).

On remand, the Eleventh Circuit sidestepped the Supreme Court's mandate and avoided the equitable estoppel question altogether by finding that the parties had agreed to arbitrate per the plain contract terms. *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944 (11th Cir. 7/8/2022), 2022 WL 2643936, at *3. In a concurring opinion, Judge Gerald Bard Tjoflat pointed out that even though the Supreme Court gave a "clear directive" to determine whether state or federal law applied to the non-signatory's attempt to enforce the Convention through equitable estoppel, the majority took another route. *Outokumpu*, 2022 WL 2643936, at *3. Judge Tjoflat, staying true to the high court's mandate, directly addressed the question presented in *GE Energy*, which was, "Whether the [Convention] permits a nonsignatory to an arbitration agreement to compel arbitration based on the doctrine of equitable estoppel." 2022 WL 2643936, at *4. He concluded that "the *Boyle* test counsels in favor of applying federal common law to threshold questions of arbitrability, which include the application of equitable estoppel to GE Energy's

37

attempt to compel arbitration as to Outokumpu." *Id.* at *6. Recognizing this was a question of first impression for the Circuit, Judge Tjoflat's analysis led him to hold that "all signs point to the conclusion that we must apply federal common law in determining whether equitable estoppel applies in [Convention] cases." *Id.*

Other post-*GE Energy* courts and commentators have likewise concluded that federal common law determines whether a party may enforce an arbitration provision through equitable estoppel. *See Setty,* 3 F.4th at 1168; *Arrive NOLA Hotel,* 2025 WL 871608, at *910; *Parish of Lafourche,* 2025 WL 754333, at *5; *Olsen Sec. Corp.*, 2025 WL 1370445, at *7; *MouseBelt Labs Pte. Ltd. v. Armstrong,* 674 F. Supp. 3d 728, 736-37 (N.D. Cal. 2023); Meshel, *supra,* at 146 ("[T]hat international commercial arbitration agreements are governed exclusively by the Convention and the FAA in turn renders them so dominated by the sweep of federal statutes and doctrines ... that the legal relations they affect must be deemed governed by federal law" and, therefore, "issues concerning such agreements, including the application of equitable estoppel by or against non-signatories, are more appropriately governed by federal rather than state law" (omission in original) (quotation omitted)); 21 Lord, *Williston on Contracts* § 57:61; 1 Born, *International Commercial Arbitration* § 10.05[A], p. 1610 ("[T]he Court in *Arthur Andersen* did not address the application of the New York Convention or Chapter 2 of the FAA, where the better view,

generally adopted by U.S. lower courts, remains that federal common law should govern issues of alter ego, agency, estoppel and the like.").

### 3.    *Bufkin* identified that clever pleading strategies to circumvent the Convention is gamesmanship that runs contrary to all notions of equity and fairness.

Another important takeaway from *Bufkin,* is that the Court should not condone procedural gamesmanship designed to circumvent arbitration under the Convention. In *Bufkin,* after filing its petition against only the domestic surplus lines insurers, Bufkin amended its petition to name the foreign surplus lines insurers alleging the foreign insurers "were culpable of the very same conduct Bufkin had originally imputed to the domestic insurers." 96 F.4th at 728. The Court determined that this amended petition was expressly filed for the purpose of then dismissing the foreign insurers "with prejudice[,] foregoing [sic] any rights against them[.];" which Bufkin then did, and the district court allowed. The *Bufkin* Court looked upon this tactic unfavorably and the epitome of unfairness:

> The upshot is that indulging Bufkin's pleading-and-then-dismissing gamesmanship by denying arbitration turns on its head the axiom that "[t]he linchpin for equitable estoppel is equity—fairness."

96 F.4th at 728.

Here, Apex has engaged in similar procedural gamesmanship specifically designed to avoid arbitration under the Convention. Despite making claims with *both* Insurers, working with *both* Insurers' claims adjusting representatives, and being

paid for claims under the Policy through funds paid by *both* Insurers, Apex only sued the domestic insurer, ISIC, foregoing any recovery from Lloyd's 36% participation in the Policy. The sole reason Apex is cutting Lloyd's out from the litigation is to circumvent the Convention—precisely what Bufkin did. [ROA. 25-30107.295-296.] Just as it was in *Bufkin*, Apex's failing to name the foreign insurer as a direct defendant is gamesmanship that turns on its head the concept of equitable estoppel and should not be allowed.

### C. The Arbitration Agreement's delegation clause requires the Court to compel arbitration.

Even if uncertainty about the enforceability of the Arbitration Agreement exists, the Policy's delegation clause requires that the arbitration tribunal should resolve it. "[A] valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Kubala v. Supreme Prod. Servs., Inc*., 830 F.3d 199, 202 (5th Cir. 2016). The Policy's Arbitration Agreement includes the following delegation clause: "All matters in difference between the Insured and the Companies ... in relation to this insurance, including its formation and validity, and whether arising during or after the period of this insurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out." [ROA.25-30107.123.] Multiple courts have recognized that this language constitutes a delegation clause. *See 5556 Gasmer Mgmt*., 463 F. Supp. 3d at 788, 790 (collecting cases interpreting identical language).

"[I]f the party seeking arbitration points to a purported delegation clause, the court's analysis is limited" and entails two steps. *Kubala,* 830 F.3d at 202. The first step "is contract formation—whether the parties entered into any *arbitration agreement at all." Id.* at 201. As to the second step, "the only question ... is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Id.* at 202. "If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases." *Id.*

Application of the two steps here shows that any uncertainty about the validity of the arbitration provision's enforceability should be resolved by the Arbitration Tribunal. As to the first step, there is a contractual agreement to arbitrate. [ROA.25-30107.123-124.] As to the second step, the arbitration provision's delegation clause covers all conceivable disputes relating to the Policy, including issues of "formation and validity." [ROA.25-30107.123.]. It is thus for the Arbitration Tribunal to decide whether the domestic insurers and foreign insurers are all parties to the Policy or whether the domestic insurers are entitled to enforce the Convention through equitable estoppel. Because "there is a delegation clause, the motion to compel arbitration should be granted" without more. *Kubala,* 830 F.3d at 202.

## VII. Conclusion

When ISIC and Lloyd's entered into this surplus lines insurance contract with Apex, they did so with the intent that any and all disputes would be subject to arbitration under the Convention. And, under the circumstances, this Policy meets all the factors necessary to compel arbitration under the Convention. But even if the Court does not properly construe this surplus-line insurance policy as one contract, ISIC would still be entitled to invoke equitable estoppel to compel arbitration under the Convention because Apex alleged substantially "interdependent and concerted conduct" by the domestic and foreign Insurers in handling its insurance claims and failed to differentiate between the conduct of the foreign insurer (Lloyd's) and the domestic insurer (ISIC). Lastly, the Louisiana Supreme Court's interpretation of LA. REV. STAT. § 22:868 in *Police Jury* does not alter this outcome as this Court is bound by Fifth Circuit decisions determining arbitrability under the Convention, namely, *Bufkin*. This Court should reverse the district court's vacating its previous order compelling arbitration and instruct the district court to reinstate the original order.

Respectfully submitted,

s/*Raymond C. Lewis*
Raymond C. Lewis (#31236)
rlewis@deutschkerrigan.com
Joseph L. McReynolds (#01947)
jmcreynolds@deutschkerrigan.com
Bryce M. Addison (#36345)
baddison@deutschkerrigan.com
Sean P. Mount (#27584)

smount@deutschkerrigan.com
**DEUTSCH KERRIGAN, L.L.P.**
755 Magazine Street
New Orleans, LA  70130
(504) 581-5141

*Attorneys for Appellant Independent Specialty
Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2025 I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users and will be served by the appellate CM/ECF system.

_____*/s/ Raymond C. Lewis*_____
Raymond C. Lewis

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

With Type-Volume Limitation, Typeface Requirements, and Type
Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,373 words. excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(ii) and Lo. R. Rule 32.2.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and Local Rule 32.1 because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font, except that the footnotes are in 12 point proportionally spaced typeface.

_/s/ Raymond C. Lewis_
Raymond C. Lewis
Dated: _July 14, 2025